## Schroeder v. Jaquiss

C.P. of Allegheny County, no. GD 98-5519.

*Michael T. Collis,* for plaintiffs.
*Paula Koczan,* for defendant Jaquiss.
*Andrew G. Kimball,* for defendants Kamerer, Goldman and UPMC.

FRIEDMAN, *J.,* July 27, 2001—Defendant Jaquiss asserts nine instances of error in her motion for post-trial relief:

"(1) The trial court erred in ruling that the Dead Man's Act had been waived.

"(2) The trial court erred in limiting the cross-examination of plaintiff's expert, Marvin I. Matz M.D., when defendant was precluded from cross-examining the expert on a standard work in the field.

"(3) Dr. Matz was permitted to offer opinion testimony which fell beyond the scope of his stated area of expertise.

"(4) The trial court erred in denying defendant's motion for partial nonsuit on plaintiff's claims for negligence.

"(5) Defendant was not permitted to cross-examine Stephen Goldman M.D. as to the description of the procedure identified in the consent form for the August 20, 1997 surgery.

"(6) The trial court erred in precluding defendant from offering any evidence regarding the professional background and competency of Dr. Jaquiss.

"(7) The trial court erred in refusing to grant defendant's requested points for charge on the issue of informed consent.

"(8) The trial court erred when it refused to submit separate jury interrogatories on the theories of negligence and informed consent.

"(9) The verdict was against the weight of the evidence."

Although the caption has not yet been changed to reflect this, plaintiff husband had withdrawn his claim for loss of consortium during the trial. The verdict was in

favor of plaintiff wife only and this memorandum will therefore refer only to her as plaintiff.

### 1. *The Dead Man's Act Was Waived*

The most crucial of the above items is the issue of the Dead Man's Act. The court's reasoning was set forth in a written memorandum contemporaneous with the pretrial ruling now complained of. That "memorandum in support of order granting plaintiff's motion in limine to permit testimony otherwise barred by the Dead Man's Rule, based on waiver" is incorporated herein by reference.

The court's actual ruling was made at pages 48-53 of the transcript of March 28, 2001, and then typed up. Once the court ruled that the Dead Man's Act had been waived, it noted Jaquiss' continuing objection on that point for the balance of the trial. (Transcript of March 28, 2001, pp. 56 and 64.) It should also be noted that Jaquiss suggests that her objections to testimony that would violate the Dead Man's Act are *implicit.* (Transcript of March 28, 2001 at pp. 30 *ff.*)

During oral argument, the undersigned also distinguished a case relied on by Jaquiss, *Chase v. Groff,* 410 F. Supp. 602 (E.D. Pa. 1976). See transcript of March 28, 2001, pp. 32-33.

In addition, there is no basis in our adversary system for the suggestion by Jaquiss that *plaintiff* should have noted Jaquiss' Dead Man's Act objection at any deposition. (Transcript of March 28, 2001, pp. 45-46.)

Jaquiss waived the benefit of the Dead Man's Act.

## 2. *A Journal Article Is Not the Legal Equivalent of a Standard Text, So the Court's Refusal To Permit Plaintiff's Expert To Be Cross-Examined on an Article With Which He Was Unfamiliar Was Not Error*

Trial counsel for defendant Jaquiss argued that the *American Journal of Otology* was a "standard work" in the field and was the proper subject for cross-examination of plaintiff's expert, Dr. Marvin I. Matz.[1] The court properly concluded that although the journal may indeed be respected, that does not mean that one article in one issue thereby becomes "a *standard work* in the field." See transcript of proceedings of March 27, 2001, pp. 205, l. 1-208, l. 8, pp. 228, l. 17-232, l. 12.

## 3. *Dr. Matz Was Well-Qualified To Give Opinion Testimony in the Area of Medicine at Issue, Surgery for an Adenoma of the Ear*

Defendant Jaquiss argued that Dr. Matz was not qualified to testify with regard to the type of procedure used in this case because he admitted he had not performed surgery on this type of lesion and had not performed surgical procedures for several years. The court properly concluded that this went to the weight of Dr. Matz' testimony, not his qualifications. See transcript of proceedings of March 27, 2001, pp. 148-53, 158-60.

In her motion for post-trial relief, Jaquiss complains that "no *Frye* hearing was conducted in this case to de-

---

1. Defendant Jaquiss was represented by different counsel at the argument on post-verdict motions, however, the position of Jaquiss on the nature of the journal as a "standard work" remains unchanged.

termine whether Dr. Matz' testimony was competent."
(Jaquiss motion, ¶19.) The record shows that no *Frye*
hearing was requested, so this ground for objection is
waived. Counsel for Jaquiss *did* question Dr. Matz on
the fact that he had never personally treated this type of
tumor (transcript of proceedings of March 27, 2001, p.
203) and the fact that his opinion was not based upon
medical research he himself had done. (p. 209.) There
was certainly no need for a *Frye* hearing given the fact
that this area of medicine is well-recognized in the pro-
fession. A *Frye* hearing is addressed to the *area* of in-
quiry and its legitimacy, not to the *qualifications* of the
witness. If the *Frye* hearing reveals an area is not suffi-
ciently recognized, then the witness' qualifications to
opine in the area are irrelevant.

### 4. *Defendant's Motion for Partial Nonsuit on Plaintiff's Claims for Negligence Was Properly Denied*

Jaquiss argues that since plaintiff's expert, Dr. Matz,
testified that there were two possible procedures which
could be performed in plaintiff's situation, neither pro-
cedure was clearly wrong under the "two schools of
thought" doctrine. However, she mischaracterizes what
Dr. Matz said.

"Counsel for Jaquiss: Would you agree there are other
respected doctors that would treat this cancer—other
schools of thought that would treat this cancer in the way
it was treated here?

"Dr. Matz: In medicine that is [sic] always other
schools of thought.

"Counsel for Jaquiss: Do you agree with that?

"Dr. Matz: Yes.

*"It does not make it reasonable.* I agree that some people are very, very aggressive.

"Counsel for Jaquiss: I am talking about respected surgeons?

"Dr. Matz: Yes.

"When they do these kind of procedures, it is a very, very aggressive procedure." Transcript of proceedings of March 29, 2001, p. 204, l. 12-25. (emphasis added)

Clearly, Dr. Matz agreed that some physicians were very aggressive but he did *not* agree this approach was "reasonable," nor did he suggest or admit that there were two valid ways to approach this. For purposes of the *nonsuit* motion, the evidence was that there were *not* "two schools of thought" regarding *plaintiff's* adenoma. Dr. Matz unequivocally said it was not "reasonable" of a doctor to take the aggressive approach that defendants did in this case.

Jaquiss also argued that Dr. Matz had testified that nerve damage such as that experienced by the plaintiff could be caused by "other mechanisms." (Words of Jaquiss' counsel, transcript of March 29, 2001, p. 44.) Jaquiss therefore argued in support of her motion for nonsuit that there was no clear statement that the standard of care was breached, and that the negligence claim therefore should not go to the jury. (Transcript p. 45.) The court disagreed. On the issue of causes of injury, Dr. Matz *did* make the following statement:

"Counsel for Jaquiss: Doctor, you do not know to a reasonable degree of medical certainty precisely what

event—what event or what type of event resulted in injury to the facial nerve?

"Dr. Matz: No. All I know is location.

"Counsel for Jaquiss: Yes, that is correct.

"Dr. Matz: Yes.

"Counsel for Jaquiss: You do not know the event?

"Dr. Matz: No, I do not know the event." (Transcript of March 27, 2001, p. 199, ll. 16-24.)

However, Dr. Matz also stated:

"Counsel for Jaquiss: It is not uncommon for a patient to have facial nerve paralysis after a surgery like this?

"Dr. Matz: Unfortunately it happens too often. *It should not happen.*

"Counsel for Jaquiss: Is it common that this can happen for a number of reasons?

"The Court: Is this temporary or permanent?

"Counsel for Jaquiss: Can you give me a percentage?

"Dr. Matz: It does happen. I cannot give you an answer.

*"If the surgery is done right, it should be temporary. If it is permanent, then something is probably wrong. Something was done wrong."* (Transcript of March 27, 2001, p. 202, ll. 4-17.) (emphasis added)

## 5. *The Court Properly Did Not Permit Defendant To Cross-Examine Dr. Stephen Goldman, No Longer a Party, Regarding His Expert Opinion on the Surgery*

Dr. Goldman had assisted in the surgical procedure at issue in this case. In her motion, defendant Jaquiss now argues that the court improperly precluded Dr. Goldman from testifying as to the "description of the procedure identified in the consent form." The court understands Jaquiss to mean the court erred in barring Dr. Goldman from testifying about the *distinction* between the procedure identified on the consent form and the procedure performed. The ruling was based on the fact that since Dr. Goldman was no longer a defendant in the case, he therefore was barred by the rules of court from giving such an opinion because no expert report had been filed on his behalf. In addition, Dr. Goldman stated that he could not remember whether he saw the consent form prior to the operation. (Transcript of March 29, 2001, p. 120, ll. 7-10.) Dr. Goldman, like any other witness under the Rules of Evidence, is permitted to only testify to what he *observed* on the day in question. In any case, there was no prejudice to Jaquiss because other defense witnesses did testify regarding this distinction. It is also possible that this objection was waived when counsel for Jaquiss agreed to rephrase the question. (Transcript of March 29, 2001, p. 119, ll. 12-16.) (See generally, transcript of March 29, 2001, pp. 116-23, regarding Dr. Goldman's testimony.)

### 6. *The Trial Court Properly Barred Jaquiss "From Offering Any [Extensive] Evidence Regarding the Professional Background and Competency of Dr. Jaquiss"*

The issue here was whether Dr. Kamerer could testify regarding the credentials of Dr. Jaquiss and his level of competency as a surgeon. The court, in precluding this testimony, took it as being evidence of reputation and therefore ruled, properly, that reputation evidence would only be admissible to prove *character.* See Pa. Rule of Evidence 405. The court also noted at trial and reiterates that Dr. Jaquiss' *competence* was not at issue. Jaquiss' argument is analogous to that of a driver attempting to show that he was licensed, well-trained, and usually skillful in order to prove that he was not negligent in a particular automobile accident.

It should also be noted that the court had already permitted Dr. Kamerer to testify to the effect that Dr. Jaquiss was well-qualified to do the surgery. See transcript of March 30, 2001, pp. 10-13. The issue in this case was *not* whether the surgery that was done was performed skillfully; rather, the issue is whether it was negligent to perform that particular kind of surgery at all given the low-grade nature of the cancer involved and the horrific and unavoidable side effect of the procedure. A related issue is whether plaintiff was told at all of the unavoidable side effect of virtual deafness and tinnitus.

### 7. *The Charge to the Jury on the Issue of Informed Consent Complied With the Applicable Pennsylvania Law*

Defendant Jaquiss argues that her proposed points for charge were correct under the new codification of the Health Care Services Malpractice Act, and that the court's were not. We declined to include defendant Jaquiss' proposed points on the issue verbatim because they were covered in the charge as worded by the court. See the in-chambers discussion of the points for charge in the transcript of March 30, 2001, pp. 195-206, and the charge itself in the transcript of April 2, 2001, pp. 91-95.

At the transcript of March 30, 2001, p. 205, ll. 7-12, during in-chambers discussions with counsel, the court *agreed* to instruct the jury along the lines that Jaquiss requested, stating that "[b]ut the order in which I'm going to say it is he has a duty to disclose these risks to her. If, however, she's learned them from some other source before she signs the consent, then even if he doesn't disclose it, it's okay."

After the jury was charged, the court asked counsel if it had given all the instructions it had promised to give. Counsel for Jaquiss referred only to the failure to read *word-for-word* her proposed point number 22. Jaquiss' point number 22 is:

"Pennsylvania law does not require physicians to discuss personally the information regarding the nature or risks of an operation with a patient. What is important is that the plaintiff receive or possess the information from whatever source sufficient to enable him or her to con-

sent to an operation in an informed and knowledgeable manner." See transcript of April 2, 2001, pp. 101-102.

If the court in fact omitted to charge on a promised *concept,* that was not brought to its attention at that sidebar conference and so is waived.

### 8. *Jaquiss Did Not Preserve the Issue of Separate Jury Interrogatories on the Theories of Negligence and Informed Consent. If the Issue Was Not Waived, the Trial Court's Refusal of Another Defendant's Request Was Proper*

Defendant Jaquiss argues that because the case proceeded to the jury on both negligence and informed consent theories, the interrogatories to the jury should have contained separate sections for negligence and informed consent. The interrogatories, as submitted to the jury, asked whether the defendants were liable to Mrs. Schroeder, without differentiating between the two theories. Defendants, including Jaquiss, asked the court to add a question on substantial factor (not a disputed issue). However, the record reflects that only defendant Kamerer objected to the court's decision not to add questions involving the two theories. (Transcript of April 2, 2001, p. 5.) Jaquiss noted only an objection regarding substantial factor. (April 2, 2001, p. 6.) This basis for relief has been waived.

See the in-chambers discussion of the interrogatories to the jury in the transcript of April 2, 2001, pp. 3-10.

## 9. *The Verdict Was Not Against the Weight of the Evidence*

There is clearly sufficient evidence to support the jury's finding.

## DELAY DAMAGES

With regard to the claim for delay damages, it appears that defendant Jaquiss did not answer or object to plaintiff's motion for delay damages or the calculation of the amount to be awarded. We therefore award the amount requested, $182,125.

Both plaintiff Janice Schroeder and defendant Kamerer made alternative or contingent post-trial objections and requests regarding a new trial in the event the court were to have granted defendant Jaquiss' motion for post-trial relief. Since that motion was denied, those objections and requests are moot and need not be discussed further.

## ORDER

And now, to-wit, July 27, 2001, after consideration of defendant Jaquiss' motion for post-trial relief, it is hereby ordered that the said motion is denied, for the reasons set forth in the attached memorandum.

It is further ordered that plaintiffs' motion for delay damages is granted as to Janice C. Schroeder only, plaintiff Theodore C. Schroeder, at trial, having voluntarily withdrawn his claim against the defendants, as is noted on the verdict slip of April 2, 2001. The verdict is hereby modified to include delay damages in the amount of $182,125, resulting in a total verdict in favor of plaintiff

Janice C. Schroeder and against defendant Lynn Jaquiss, executrix of the estate of G. William Jaquiss M.D., deceased, in the amount of $1,182,125, and the prothonotary is directed to enter judgment accordingly.

It is also noted that plaintiff's post-trial objections and defendant Kamerer's request (contained in his response to defendant Jaquiss' motion) regarding the scope of a new trial, are moot and need not be decided by this court.